Paul Batista
*Attorney-at-Law*
*and Attorney of Record*
Paul Batista, P.C.
26 Broadway – Suite 1900
New York, New York 10004
(631) 377-0111
Batista007@aol.com

Michael McNutt
*Of Counsel*
Lazareff Le Bars Eurl
10, Place Vendôeme
Paris, France 75001
mcnutt@l-lb.com

Benoit Le Bars
*Attorney-at-Law*
*and Of Counsel*
Lazareff Le Bars Eurl
10, Place Vendôeme
Paris, France 75001
lebars@l-lb.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

FRANK CORSINI; LIBERTY-CITIC ENERGY
CAYMAN LTD.; and LIBERTY ECO ENERGY
LLC,

                         Plaintiffs,

                -against-

DENTONS US LLP; EDWARD J. REICH;
JAMES M. COSTAN; JEFFREY S. GERON;
BOIES SCHILLER FLEXNER LLP;
CHRISTOPHER GREEN; IAN DUMAIN; and
WILLIAM OHLEMEYER,

                         Defendants.

------------------------------------------------------------------ x

: 24 Civ.
:
: **COMPLAINT UNDER THE**
: **RACKETEER INFLUENCED**
: **AND CORRUPT**
: **ORGANIZATIONS**
: **ACT AND FOR OTHER RELIEF**
:
:
: **JURY TRIAL DEMANDED**
:
:
:

        Plaintiffs by and through their attorney, Paul Batista, P.C., for their Complaint

against defendants allege as follows:

1

## Preliminary Statement

1.     This action is brought principally under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 ("RICO"), against two major law firms – Dentons US LLP ("Dentons") and Boies Schiller Flexner LLP ("Boies Schiller") – which represented plaintiffs Frank Corsini and two entities associated with Mr. Corsini, Liberty ECO Energy LLC ("Liberty ECO") and Liberty-CITIC Energy Cayman Ltd. ("Liberty-CITIC").

2.     As described in greater detail in the balance of this Complaint, Dentons and Boies Schiller, together with several of the firms' partners, associates and employees also named as defendants, were engaged over the course of numerous years in wholesale acts of fraud, extortion, obstruction of justice, perjury, subornation of perjury, substantive violations of RICO, conspiracy to commit acts in violation of RICO, and other misconduct by which defendants repeatedly damaged and misled Mr. Corsini, Liberty ECO and Liberty-CITIC and engaged in blatant violations of ethical principles of professional responsibility and in self-dealing to the detriment and damage of plaintiffs.

## The Parties

*A.     The Plaintiffs*

3.     Plaintiff Frank Anton Corsini is a citizen of the United States and resident of Massachusetts.

4.     Plaintiff Liberty ECO is a Delaware limited liability company with its registered office in 711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

5.     Plaintiff Liberty-CITIC, a wholly-owned subsidiary of plaintiff Liberty ECO, is a company incorporated on August 31, 2012, under the laws of the Cayman Islands with its registered office in Grand Cayman (Cayman Islands), KY1-1104, Ugland House.

6.     Both Liberty-CITIC and Liberty ECO were established by Mr. Corsini and by El Hadj Mohammed Kane ("Mr. Kane"), who relinquished his member interest in Liberty ECO prior to plaintiffs' retention of defendant Boies Schiller.

7.     Plaintiffs Liberty ECO and Liberty-CITIC operated essentially in the field of energy projects.

B.     *The Defendants*

8.     Defendant Dentons is a law firm with its principal place of business at 1221 Avenue of the Americas, New York, New York 10020-1089.

9.     Defendant Edward J. Reich ("Reich") is an attorney admitted to practice in New York and, upon information and belief, at all times relevant to this Complaint was a partner of defendant Dentons.

10.     Defendant James M. Costan ("Costan") is an attorney admitted to practice in the District of Columbia and, upon information and belief, at all times relevant to this Complaint was a partner of defendant Dentons.

11.     Defendant Jeffrey S. Geron ("Geron") is an attorney admitted to practice in New York and, upon information and belief, at all times relevant to this Complaint was a partner of defendant Dentons.

12.     Defendant Boies Schiller is a law firm with its principal place of business at 55 Hudson Yards, 20th Floor, New York, New York 10001.

13.     Defendant Christopher Green ("Green") is an attorney admitted to practice in New York and, upon information and belief, at all times relevant to this Complaint was a partner of defendant Boies Schiller.

14.     Defendant Ian Dumain ("Dumain") is an attorney admitted to practice in New York and, upon information and belief, at all times relevant to this Complaint was a partner of defendant Boies Schiller.

15.     Defendant William Ohlemeyer ("Ohlemeyer") is an attorney admitted to practice in New York and, upon information and belief, at all times relevant to this Complaint was a partner of defendant Boies Schiller.

### Jurisdiction and Venue

16.     This Court has subject matter jurisdiction under 18 U.S.C. § 1964(c) with respect to the claims arising under RICO.

17.     This Court in addition has jurisdiction under 28 U.S.C. §§ 1331 and 1332 with respect to diversity of citizenship and the fact that the amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) and under 18 U.S.C. § 1965.

### Statement of Facts Common to All Counts

A.     *Summary of General Background*

19.     In early 2012, the Republic of Sénégal ("Sénégal"), the westernmost nation in Africa on the coastline of the Atlantic Ocean, was experiencing severe problems with delivery of energy to its citizens and industries.

20.     On May 16, 2012, plaintiffs, acting primarily through Mr. Corsini, entered into an engagement agreement with Dentons for the purpose of Dentons' providing, among other things, legal services and advice to advance plaintiffs' plan and intention to improve the delivery and distribution of power in Sénégal and elsewhere, including the United States.

21.     In 2012, plaintiffs, represented by defendant Dentons, entered negotiations with Société Nationale D'Électricité du Sénégal ("SENELEC") to develop a large energy generation facility.

22.     SENELEC is a Senegalese power supply state-owned entity.

B.     *The Initial Negotiations with SENELEC*

23.     On August 18, 2012, Mr. Corsini and Mr. Kane sent to Macky Sall, the President of Sénégal, a letter expressing plaintiff Liberty ECO's willingness to commit to a project (the "Project") involving a power purchase agreement (the "PPA") among SENELEC, Liberty ECO, Liberty-CITIC, and Sénégal.

24.     The August 18, 2012 letter from Mr. Corsini to President Sall, in addition to addressing plaintiffs' commitment to the Project, attached a draft of a proposed PPA.

25.     The draft PPA submitted to President Sall with Mr. Corsini's August 18, 2012 letter was prepared by several attorneys at Dentons with the assistance of defendants Costan and Geron, with the participation of David Hryck ("Hryck"), another lawyer at Dentons.

26.     Defendant Costan claimed to plaintiffs – and Dentons advocated the claim – that Costan specialized in energy matters, including the structuring of energy transactions and energy-related regulation and litigation.

27.     In fact, as sworn testimony at later arbitration proceedings (the "Arbitration") before the International Court of Arbitration International Chamber of Commerce ("ICC") revealed, Dentons and Costan acted as counsel to plaintiffs in the drafting, negotiation and proposed execution of the PPA for the Project.

28.     Likewise, as later testimony at the Arbitration before the ICC disclosed, defendants Costan and Geron were the partners tasked with managing the negotiations relating to the Project and the PPA proposed by Mr. Corsini in the August 18, 2012, letter to President Sall.

29.     Acting on behalf of Mr. Corsini and the other plaintiffs, defendants Costan and Geron, together with other Dentons lawyers and employees, were involved in communications with representatives of SENELEC and Sénégal in August, September and October 2012 regarding the Project and the PPA.

C.     *Transmittal of PPA Documents*

30.     On October 13, 2012, Dentons sent an updated version of the draft PPA in the French language – which is the first language of Sénégal – to Issa Dione, a representative of SENELEC.

31.     Approximately six days after the transmittal of the updated version of the draft PPA on October 13, 2012, plaintiff Liberty-CITIC, through Dentons, forwarded on October 19, 2012, French and English versions of the PPA to SENELEC.

32.     At the direction of Dentons, purported execution versions of the PPA in French and English were forwarded to SENELEC on October 24, 2012.  The governing law of the purported execution versions of the PPA was the law of Sénégal, and the governing law of the PPA was the French language.  The "execution" versions were signed by Mr. Papa Dieng on behalf of SENELEC and by Mr. Corsini on behalf of Liberty-CITIC.

D.     *"The French Disconnetion"*

33.     Significantly, defendant Dentons did not at any point retain or engage the legal assistance of any Senegalese lawyer in connection with the negotiation or drafting of the PPA, although the governing law of the PPA was Senegalese law.  In addition, defendant Costan, the senior attorney at Dentons involved in negotiations regarding the Project and the preparation of the PPA, had no knowledge of, fluency in, or ability to read or understand the French language, the governing language of the PPA.

34.     Given the course of events from May 2012 through October 2012, as well as given Mr. Corsini's and the other plaintiffs' reliance on the purported competence and integrity of Dentons and the other Dentons-related defendants, plaintiffs were led to believe by the Dentons defendants that the PPA was in full force and effect and valid as of the date of the signing of the alleged PPA on October 24, 2012, by Mr. Dieng and Mr. Corsini.

35.     In point of fact, as Dentons knew, or in the exercise of due diligence should have known, the effectiveness and enforceability of the PPA under applicable Senegalese law depended on the explicit approval of the Board of Directors of SENELEC, and such approval was to be obtained subsequent to the execution of the PPA.  There was never any assurance that such approval would be given.  The PPA itself contained a notation to that effect which plaintiffs confirmed after consultation with Dentons before the PPA was signed by Mr. Dieng and Mr. Corsini.

36.     The Board of SENELEC never approved the PPA.

37.     Dentons completely failed to advise Mr. Corsini or the other plaintiffs that the PPA could never be effective – and indeed was never effective – in the absence of express approval by the SENELEC Board of Directors.

38.     Dentons' failure to advise plaintiffs of the non-existence of a valid and enforceable PPA under Senegalese law and in the French language had, as detailed later in this Complaint, disastrous financial and legal consequences for years on plaintiffs.

39.     Upon information and belief, Dentons' failure correctly to advise plaintiffs was based, at least in part, on Dentons' scheme to extract unearned and unauthorized funds from plaintiffs.

40.     Similarly, as described later in this Complaint, defendant Boies Schiller, later acting in concert with Dentons, deliberately failed to advise Mr. Corsini and the other plaintiffs that the PPA was never effective and never constituted an enforceable contract.

E.      *Plaintiffs' Continued Reliance on Defendants' Gamesmanship*

41.     Mr. Corsini and the other plaintiffs, beginning in or about October 2012, for years relied on statements and communications by Dentons and later by Boies Schiller that the PPA was at all relevant times valid and enforceable. This reliance continued despite the emergence of red flags to Dentons and Boies Schiller that their position, to which they adhered for years in their scheme to generate millions of dollars in fees and seize controlling interests in Liberty ECO and Liberty-CITIC, was utterly flawed, as the ICC Arbitration ultimately determined.

42.     As early as January 3, 2013, Sénégal's Minister of Energy and Mines stated in a letter which was received by the Dentons defendants: "The signature of SENELEC's General Manager was subject to approval of [SENELEC's] Board of Directors. After examining the PPA, the French government made a number of observations that should be taken into account." Dentons ignored this statement by Sénégal's Minister of Energy and Mines.

43.     Notwithstanding the fact that the January letter from Sénégal's Minister of Energy and Mines conveyed the clear message that the PPA was not effective, binding and valid, the Dentons defendants continued falsely to assure Mr. Corsini and the other plaintiffs that the PPA was effective as of October 2012.

44.     Representatives of SENELEC, Mr. Corsini, and defendant Costan met on February 5, 2013, at Dentons' New York office.

45.     In a continuation of the charade Dentons was pursuing, defendant Costan on February 26, 2013, sent plaintiffs a document which Dentons misleadingly entitled "First Amended and Restated Power Purchase Agreement."

8

46.     In reality, the document transmitted on February 26, 2013, by Dentons was deceptively designed by the Dentons defendants to further the illusion Dentons had created to make Mr. Corsini and the other plaintiffs believe that there was as of October 2012 a valid, fully effective underlying PPA.

F.     *The Advent of the Amon LLC "Operating Agreement" and "Manifeste"*

47.     On March 13, 2013, Susan Clark ("Clark") filed a lawsuit in the United States (the "Clark Action") against Liberty ECO, Liberty-CITIC, Mr. Kane and others raising issues affecting the Project.  An entity named Amon LLC was also named as a defendant.

48.     After the filing of the Clark Action, Dentons and Mr. Corsini, on behalf of himself, Liberty ECO and Liberty-CITIC, executed a further engagement letter in which Dentons undertook responsibility "to provide legal assistance to you in relation to your [*i.e.*, plaintiffs'] tax and corporate structuring, transactional negotiation for your various projects, [and] general corporate matters related thereto."  Dentons already knew that its prior advice and representations to plaintiffs were false.

49.     On April 26, 2013, an operating agreement prepared by Dentons (the "Operating Agreement") to which Clark, Mr. Kane and Amon LLC were parties was executed.  According to Dentons, the purpose of the Operating Agreement was to define the role which Clark was to play in Amon LLC and the Project.

50.     On April 30, 2013, Dentons directed plaintiff Liberty-CITIC to sign with SENELEC a document in French entitled *Manifeste d'intention exécutoire aux fins de revision et de mise à jour du Contrat d'achat d'énergie* ("Manifeste").

51.     Upon information and belief, the Manifeste was prepared by the Dentons defendants without the assistance or guidance of any lawyer or lawyers in Sénégal.  This document was written in the French language with the governing law designated as the law of Sénégal.

52.     As previously alleged, the Dentons defendants did not speak, did not write, and did not read French, and none of the Dentons defendants was qualified to provide legal advice under Senegalese law.

53.     At no point did the Dentons defendants seek or receive the assistance of Senegalese lawyers.  Such assistance, as defendant Dentons must have known, was essential to the proper representation of Mr. Corsini and the other plaintiffs.  Dentons deliberately failed to advise Mr. Corsini and the other plaintiffs that the assistance of Senegalese lawyers was crucial to serving plaintiffs' interests effectively.

G.     *Dentons' Purported Termination of Services and the Corrupt Aftermath*

54.     In pursuit of its overall corrupt scheme to harm Mr. Corsini, Liberty ECO and Liberty-CITIC, Dentons on November 27, 2013, sent plaintiffs an email and letter in which Dentons unilaterally purported to terminate its role as counsel to plaintiffs, allegedly because of plaintiffs' failure to pay Dentons' invoices of approximately $1.9 million in legal services, and to withdraw from its representation of plaintiffs.

55.     Dentons' purported withdrawal as counsel and termination of services, accompanied by Dentons' demand for $1.9 million in legal fees, was, as later events revealed, merely a stage in an elaborate scheme by Dentons, and later joined by Boies Schiller, to steal money from Mr. Corsini, Liberty ECO and Liberty-CITIC.

H.     *The Emergence of Boies Schiller*

56.     Boies Schiller, Mr. Corsini, Liberty ECO and Liberty-CITIC entered their first engagement letter on September 17, 2015, pursuant to which Boies Schiller undertook to represent Liberty-CITIC and Liberty ECO in future arbitration proceedings before the ICC against SENELEC and Sénégal pursuant to the PPA.

57.     In December 2015, Boies Schiller circulated a term sheet among Liberty ECO, Liberty-CITIC, CWBSF Electric LP ("CWBSF"), and Dentons.  CWBSF was, upon information and belief, a litigation funding firm.

58.     On January 29, 2016, a memorandum (the "Funding Memorandum") was circulated among Boies Schiller, Mr. Corsini, and Clark, among others, which embodied a funding agreement in connection with claims by Liberty-CITIC and Liberty ECO against SENELEC and Sénégal.

59.     The Funding Memorandum made it clear, among other things, that Dentons would be paid from the funding to be provided by CWBSF in exchange for Dentons' corrupt cooperation with Boies Schiller.

60.     Upon information and belief, defendants Boies Schiller and Dentons perpetrated an ongoing and illicit scheme, one of the central objects of which was for Dentons to receive money for its cooperation, including the falsification of sworn testimony by Costan, in any future Arbitration by Liberty-CITIC and Liberty ECO against SENELEC and Sénégal before the ICC.

61.     In furtherance of the scheme, Boies Schiller entered an updated engagement letter on February 1, 2016 (the "February 2016 Engagement Letter") with Liberty ECO and Liberty-CITIC solidifying Dentons' cooperation in the Arbitration on any and all terms to be dictated by Boies Schiller.

62.     Indeed, the February 2016 Engagement Letter clarified that Boies Schiller was to receive cooperation from Dentons in the Arbitration and that Dentons conditioned its cooperation on the assurance that its existing fee claim against Liberty ECO and Liberty-CITIC for approximately $1.9 million would be paid by the litigation funding entity, CWBSF.

63.     In the period in which the corrupt scheme was evolving, Boies Schiller made no effort to determine whether there was a valid and enforceable PPA relating to the Project between Liberty ECO and Liberty-CITIC, on the one hand, and SENELEC and Sénégal, on the other hand.  As detailed later in this Complaint, the arbitral panel of the ICC ultimately determined there was never a valid and enforceable PPA.

I.      *Defendants' Extortionate Acquisition of Interests in Liberty ECO and Liberty-CITIC through Arbitration or Settlement Proceeds*

64.     On September 17, 2015, defendant Boies Schiller and plaintiffs entered into an engagement letter providing a complex compensation scheme for Boies Schiller that included provisions under which Boies Schiller would receive at least (i) 40% of the proceeds awarded to plaintiffs in any ICC arbitration or arbitration under the auspices of the International Center for Settlement of Investment Disputes ("ICSID") and/or payment by Sénégal or SENELEC to settle any such disputes and (ii) 100% of any costs award to plaintiffs in any ICC or ICSID arbitration proceedings (the "2015 Boies Schiller Initial Engagement Letter").

65.     Furthermore, the 2015 Boies Schiller Initial Engagement Letter was contingent on Boies Schiller securing funding from a third-party litigation funder with which Boies Schiller would enter into a separate contract containing conditions to which only Boies Schiller and the funder would have knowledge, not plaintiffs.

66.     On February 1, 2016, Boies Schiller prepared and secured an updated engagement letter which maintained the complex fee arrangement and expressly confirmed the use of third-party funding by Boies Schiller through a "prepaid forward purchase agreement" and authorization for the retention of a third-party to assist Boies Schiller pursuant to which plaintiffs would be required to pay an additional share from the proceeds of an ICC or ICSID arbitration or settlement to the third-party funder (the "2016 Boies Schiller Updated Engagement Letter").

67.     Boies Schiller further required plaintiffs to replace the 2016 Boies Schiller Updated Engagement Letter with a new engagement letter on July 8, 2016 which continued to contain the complex compensation structure for Boies Schiller and provided other additional conditions for plaintiffs (the "2016 Second Updated Engagement Letter"), which provided for a further addendum on December 29, 2016 (the "2016 Addendum").

68.     In order to obtain the compensation, indemnification, and other conditions of the prior engagement letters and all of their amendments and addendums, Boies Schiller maintained that the PPA was effective, valid and enforceable and thus formed the basis for claims that the arbitration provisions were themselves valid and enforceable.

69.     Boies Schiller furthered its complex and corrupt scheme by determining that the value of the damages Boies Schiller was to claim from SENELEC and Sénégal in any arbitration was in excess of $250 million, as Boies Schiller in fact stated in its initial Request for Arbitration to the ICC.

70.     Boies Schiller's claim to more than $250 million in damages was asserted despite the fact that Boies Schiller never made an analysis or determination which would have revealed that no valid or enforceable PPA ever existed.  Nor did Boies Schiller ever analyze or determine that Dentons had improperly concluded that a valid and enforceable PPA existed.

71.     Crucially, plaintiffs agreed to the terms and conditions of the Boies Schiller engagement letter, its amendments, and its addendum – all of which included highly complex compensation structures calculated almost exclusively to benefit Boies Schiller – based on plaintiffs' reliance on the Boies Schiller and Dentons representations and assurances that the PPA was valid and enforceable.  But for defendants' representations and assurances regarding the validity and enforceability of the PPA – all of which representations and assurances were

13

deliberately and recklessly false – plaintiffs would never have agreed to the terms and conditions of the Boies Schiller engagement documents.

J.     The Dentons-Boies Schiller Deal

72.     In a separate agreement dated December 6, 2016, defendant Boies Schiller, defendant Dentons and plaintiffs entered into an agreement (the "Agreement" or the "December 2016 Agreement") which perpetuated the scheme among defendants that ultimately involved, among other things, subornation of perjury, actual perjury, extortion, fraud, and obstruction of justice by these defendants and others to cause significant financial damage to Mr. Corsini, Liberty ECO and Liberty-CITIC in violation of RICO, among other offenses.

73.     The December 2016 Agreement was deliberately entered into in order for Boies Schiller to secure its ability to control the arbitration process in furtherance of the 2016 Boies Schiller Updated Engagement Letter.

74.     The December 2016 Agreement contained numerous illegal provisions as well as evidencing a prolonged conspiracy among defendants which victimized Mr. Corsini, Liberty ECO and Liberty-CITIC.  The signatories to the December 2016 Agreement were Dentons, acting through defendant Reich; Boies Schiller, acting through defendant Green; and Liberty ECO and Liberty-CITIC, acting through Mr. Corsini.

75.     The underlying provisions of the December 2016 Agreement were misleading and fraudulent and, in effect, evidenced the performance of a plan and pattern of then-existing and future criminal conduct by defendants.

76.     Defendants Dentons and Boies Schiller continuously maintained that the PPA was valid and effective in order to induce plaintiffs to enter into the December 2016 Agreement, which included provisions that required plaintiffs to indemnify Dentons, Boies Schiller and the other defendants.  In addition, the December 2016 Agreement provided that in the

14

event no award was issued in favor of Liberty-CITIC, Dentons would have the right to pursue

plaintiffs for collection of any alleged Dentons receivables.

77.    In effect, this conduct constituted fraudulent, self-serving and further

corrupt conduct by defendants and ultimately caused plaintiffs significant damages.

78.    More specifically, the illegal scheme was reflected in the following

provisions of the December 2016 Agreement:

(a)    The Agreement falsely recited that Dentons had secured on behalf of Liberty ECO a PPA among Liberty-CITIC and SENELEC dated October 24, 2012 when, in fact, no valid and enforceable PPA ever existed;

(b)    The Agreement also asserted, with no genuine factual basis, that Liberty ECO owed Dentons $1,883,909.10 (the "Dentons Receivable");

(c)    The Agreement recited that Liberty ECO had engaged Boies Schiller, on a contingency basis, to prosecute "contract claims" before the ICC against Sénégal and SENELEC when in fact, as defendants knew, no enforceable contract claims existed;

(d)    The Agreement recited that Boies Schiller "desire[d] Dentons' cooperation" in the Arbitration against SENELEC and Sénégal;

(e)    The Agreement asserted that "Dentons agrees to cooperate" with Boies Schiller and defined that collaboration as the "Dentons Cooperation");

(f)    In exchange for the "Dentons Cooperation," the Agreement created several mechanisms for Dentons to receive payment for its cooperation;

(g)    The Agreement, for example, provided for the immediate payment to Dentons of $275,000 as part of the Dentons Receivable for the "Dentons Cooperation;"

(h)    The Agreement in addition obligated Dentons to "make available" to Boies Schiller, on an unlimited basis, defendant "Costan to testify as a witness" in the Arbitration and a further demand for additional compensation for any time spent by Costan for assisting other witnesses;

(i)    Moreover, the Agreement granted unlimited power to Boies Schiller to require Costan to "prepare" and "deliver" a "written witness statement" to the ICC;

(j)     Likewise, the Agreement conferred unlimited power on Boies Schiller to require Dentons to provide "access to [defendant] Costan to prepare him to testify in person at hearings" in the Arbitration for an indefinite period of time;

(k)     Similarly, the Agreement granted Boies Schiller unlimited power to require Dentons to make available "any and all then-current Dentons attorneys, consultants, experts or employees" identified in the Agreement as "Dentons Personnel;"

(l)     The agreement also provided that Boies Schiller had the right to compel Liberty ECO to "[r]eimburse Dentons its reasonable hourly rates for the participation of Dentons Personnel in any consultation between [Boies Schiller] and Dentons Personnel that is requested by" [Boies Schiller]; and

(m)     Under the Agreement, Boies Schiller purported to require Liberty ECO, Mr. Corsini and any and all of their affiliates to "fully and forever" release and discharge Dentons "and its partners, employees, agents and affiliates…from any and all disputes…liabilities, losses…of any kind whatsoever…that Liberty may have had in the past or may now have…arising directly or indirectly out of, or relating directly or indirectly to, any omissions, acts, or event occurring in connection with the PPA, PPA-related Agreements and the Litigation [*i.e.*, the Arbitration]."

K.     *The Relentless Pursuit of Defendants' Scheme*

79.     In furtherance of defendants' scheme, Boies Schiller in a memorandum dated April 18, 2017, while consistently reassuring plaintiffs that the October 2012 PPA was valid and enforceable, raised the following issue: "Does SENELEC's failure under Article 9 and Section 3.2(b) of the PPA to obtain and deliver the Sovereign Guaranty operate as the failure of a condition precedent under Article 18(a) and thereby excuse SENELEC from further performance under the PPA?"

80.     Despite the presumptive knowledge of Boies Schiller and Dentons that the October 2012 PPA was not valid and effective, defendants continued to reassure Mr. Corsini and plaintiffs that the PPA was enforceable.

81.     In reality, Dentons, Boies Schiller and the other defendants knew that they had to continue to lie to Mr. Corsini, Liberty ECO and Liberty-CITIC about the enforceability of

the PPA so that defendants could pursue a pattern of conduct that would reward them, if they succeeded in perpetuating and achieving their scheme, with millions of dollars in income from SENELEC and Sénégal and with valuable interests in any arbitration award in favor of plaintiffs or settlement.

        *L.*    *The Initiation of the Arbitration*

        82.    Boies Schiller, as counsel to Liberty ECO and Liberty-CITIC, commenced the Arbitration on June 15, 2017, when the Secretariat of the ICC International Court of Arbitration received Liberty-CITIC's Request for Arbitration.

        83.    Boies Schiller's Request for Arbitration identified SENELEC and Sénégal as the respondents when, in fact, as Boies Schiller and its co-conspirators, the Dentons defendants, knew or should have known, no basis existed for the claim since the PPA was never valid and effective. The Request for Arbitration sought not less than $250 million in damages for alleged violations of the PPA.

        *M.*    *Defendants' Evasion of Their Responsibility to Make Timely and Adequate Disclosure to Liberty ECO, Liberty-CITIC and the ICC Tribunal*

        84.    In a further deceptive manipulation of their duties to Mr. Corsini, Liberty ECO and Liberty-CITIC, Boies Schiller and the other Boies Schiller defendants, with the cooperation of the Dentons defendants, consistently evaded and delayed the disclosure of significant issues from the ICC Tribunal.

        85.    On May 1, 2018, Boies Schiller filed a statement which contained, among other things, witness statements prepared by the Boies Schiller and the Dentons defendants for Mr. Corsini and defendant Costan. The statements prepared by the Boies Schiller and the Dentons defendants contained materially false and misleading assertions.

86.     On October 10, 2018, the Arbitration Tribunal entered an order which, among other things, directed the claimants (Liberty-CITIC and Liberty ECO) "to disclose the existence and identity of any individual or entity providing financing to it [*i.e.*, claimants] for the purpose of this arbitration or having a direct economic interest in, or a duty to indemnify Claimant for, the award to be rendered in this arbitration, including any third-party funder, by October 30, 2018...." (the "Disclosure Order").

87.     In response to the Disclosure Order, Boies Schiller on October 30, 2018, made the following disclosure on behalf of Liberty-CITIC and Liberty ECO to the Arbitration Tribunal:

> [T]he following individuals or entities providing financing to [Liberty ECO and Liberty-CITIC] for the purpose of the arbitration or having a direct economic interest in, or a duty to indemnify Claimant for, the award to be rendered in this arbitration, including any third-party funder: (i) CWBSF Electric LP; [and] (ii) Dentons US LLP....

88.     The ICC Tribunal on November 1, 2018, after reviewing the inadequate disclosure statement provided by Boies Schiller, entered a further order to require Boies Schiller and its clients, Liberty ECO and Liberty-CITIC, to disclose "information on any individuals or entities behind CWBSF Electric LP" other than the partners of Boies Schiller itself "that may be providing funding [to] Claimant for the purposes of this arbitration..." (the "Further Disclosure Order").

89.     In response to the Further Disclosure Order, Boies Schiller on November 2, 2018, made the following additional statements:

> [Boies Schiller] represents Liberty-CITIC on a contingency basis and thus [Boies Schiller] can potentially be considered to have a "direct economic interest" in the award to be rendered in this arbitration, if any....[Boies Schiller], not Liberty-CITIC, has a contractual relationship with CWBSF Electric LP, pursuant to which CWBSF Electric LP provides funding...in exchange for a portion of [Boies Schiller's] interest in the award to be rendered in this arbitration, if any. Accordingly, Liberty-CITIC identified CWBSF Electric LP in its October 30

disclosure. [Boies Schiller] has no ownership stake or management role in CWBSF Electric LP.

90.     One day after responding to the ICC's Further Disclosure Order, Boies Schiller, on November 3, 2018, supplemented its disclosure by stating that "neither [Boies Schiller] nor any of its partners or employees has any ownership stake or management role in CWBSF Electric LP."

91.     The ICC Tribunal, obviously dissatisfied with Boies Schiller's disclosures, on November 6, 2018 ordered Boies Schiller in its role as attorneys for Liberty-CITIC and Liberty ECO to provide information on any individuals or entities behind CWBSF Electric LP which might be providing funding to Liberty-CITIC and Liberty ECO for the Arbitration.

92.     Under the repeated orders of the ICC to make adequate disclosure, Boies Schiller on November 6, 2018, stated that the general partner of CWBSF Electric LP was an entity known as Commonwealth Opportunity Capital GP LLC and that the limited partners of CWBSF Electric LP were CDK Associates, LLC, SENELEC Funding LLP, Commonwealth Opportunity Platform LLC, Peter and Kerri Superannuation Fund, CWOC Cayman LP and the Karathanasis Firm PLLC.

93.     Boies Schiller knowingly and intentionally did not disclose to the Tribunal the existence and use of funding at the commencement of the ICC Arbitration nor did it disclose that such funding was on the basis of a "prepaid forward purchase agreement."

94.     Defendant Boies Schiller did not disclose the December 2016 Agreement with defendant Dentons or the conditions related to such funding and the relationship to the prepaid forward purchase agreement which was required pursuant to the Disclosure Order.

N.    *The Events at the ICC Arbitration*

95.    The ICC Arbitration hearing commenced on April 29, 2019, primarily with the testimony of Mr. Corsini, who was prepared to testify by Boies Schiller attorneys, including primarily defendant Dumain.

96.    In an outrageous act of coercion and extortion in violation of 18 U.S.C. §1951, defendant Dumain, after the conclusion of Mr. Corsini's first day of testimony, berated and humiliated Mr. Corsini by insisting that Mr. Corsini had failed to give the false and misleading testimony for which Dumain had prepared him before the first day of Mr. Corsini's testimony.

97.    The confrontation between Dumain and Mr. Corsini took place in a hotel room in Paris, France, at the conclusion of Mr. Corsini's first day of testimony and before the second day of Mr. Corsini's testimony scheduled for April 30, 2018.

98.    Defendant Dumain, acting with malice and intent to extort and suborn perjury, insisted that Mr. Corsini testify falsely in accordance with instructions from Dumain, who was acting on behalf of the Boies Schiller defendants and the Dentons defendants.

99.    More specifically, Dumain instructed Mr. Corsini to testify falsely during the continued examination on April 30, 2018, in order to fabricate or bolster false claims regarding liability and the alleged damages.

100.    During the course of Dumain's irate and threatening intimidation of Mr. Corsini, Dumain stated that he and his colleagues would force Mr. Corsini, unless Mr. Corsini "did it" Dumain's way, "to get on a plane back home."

101.    Placed in fear by defendants' conduct and statements, coupled with defendants' threat to send Mr. Corsini away, Mr. Corsini testified to the ICC Tribunal on April 30, 2018 in accordance with the instructions with which Dumain coerced Mr. Corsini to comply.

102.    Likewise, defendants Boies Schiller and Dentons influenced the testimony of defendant Costan and, in so doing, suborned perjury by Costan, who knew that no valid PPA ever existed for the Project.  Defendant moreover failed to properly disclose the fact that he was obligated under the December 2016 Agreement to testify at the ICC Arbitration in any manner dictated by Boies Schiller.

O.      *The ICC's Determination*

103.    In a Final Award dated May 4, 2020, and consisting of 132 pages, the ICC Arbitral Tribunal definitively determined that the "October 2012 PPA is not a binding contract and that respondent [*i.e.*, SENELEC and Sénégal] did not breach" the alleged PPA.

104.    The Final Award also imposed on claimant [*i.e.*, Liberty-CITIC] "the costs of the arbitration fixed by the Court at USD 1,220,000."

P.      *The RICO Violations*

(i)     *Object*

105.    As articulated earlier in this Complaint, defendants and their co-conspirators fraudulently schemed to use every deceptive and extortionate tactic and trick to obstruct justice, to lie for years to Mr. Corsini and the Liberty plaintiffs, and to obtain improper advantage in the ICC Arbitration proceedings by the use of false testimony, among other things.

106.    Upon information and belief, defendants Dentons, Boies Schiller, their affiliates, and each of the other defendants knowingly conspired and agreed with each other to commit offenses against plaintiffs and the Republic of Senegal, by, among other things, (i) making materially false declarations under oath before the ICC Tribunal in violation of 18 U.S.C. §1623(a); and (ii) obstructing, corruptly influencing and impeding an official proceeding in violation of 18 U.S.C. §1512(c)(2).

107.    Defendants and their co-conspirators ultimately failed to convince the ICC Tribunal that there was a contract between plaintiff and SENELEC based upon a "contract" that never existed outside of the delusionary realm of defendants' scheme to defraud.  Indeed, the object of defendants' constantly repeated assertion that the contract was valid and in force since October 2012 was and continued to be a blatant falsehood during the ICC Arbitration proceedings.

108.    Defendants' overall object was to extract and extort legal fees, funds, and other compensation from Mr. Corsini and the Liberty plaintiffs.

*(ii)    Manner and Means*

109.    It was a part of the scheme and conspiracy that defendants Boies Schiller and Dentons made or caused to be made, or advocated, materially false representations and lies to the ICC Tribunal that:

(A)    A contract existed and was in force between Liberty-CITIC and SENELEC since October 2012;

(B)    It was an essential part of the scheme and conspiracy that each of the defendants, including but not limited to Dentons, Boies Schiller and their respective partners and associates, prepared and caused to be prepared false and fraudulent court filings; and

(C)    The other defendants knew that these filings contained materially false information and lies.

110.    Defendants repeatedly used interstate and international wire transmissions, including telephone, email, facsimile, text messages and the Internet to transmit the false, incomplete, and misleading information to further the commission of the racketeering offenses.

*Q.    Predicate Acts*

*(i)    Boies Schiller misled ICC Arbitral Tribunal as true claimant*

111.    Defendant Boies Schiller entirely controlled the claim in the ICC Arbitration because of the arrangement it made with plaintiffs pursuant to which Boies Schiller

22

was financing the Arbitration and was ultimately responsible for the decisions in the proceedings, such as when or whether to settle, the alleged value of the claim, and other decisions which should have been plaintiffs' prerogative rather than the prerogative of Boies Schiller.  Defendant Boies Schiller in addition controlled the potential value of any proposed settlement to which plaintiffs could theoretically agree because of the extortionate and manipulative terms of Boies Schiller's multiple engagement agreements with plaintiffs and the related 2016 Agreement with the Dentons defendants.

        *(ii)*     *Boies Schiller's collusion with third-party funding*

112.     Dentons unilaterally terminated Mr. Corsini and Liberty in 2013 on the basis of a claim for allegedly unpaid legal fees of approximately $1.9 million.  However, in order to keep pressure on Mr. Corsini and the Liberty plaintiffs, Dentons participated in a scheme designed to extort plaintiffs in violation of 18 U.S.C. §1951 by colluding with Boies Schiller, which would be financing Liberty to pursue the Dentons Cooperation.

113.     Boies Schiller has disclosed that, in order to satisfy its obligation to finance the litigation, Boies Schiller has itself obtained funding from a third-party in exchange for part of Boies Schiller's contingency fee.

114.     Liberty-CITIC had been deregistered as a Cayman Island company in January 2015.  Boies Schiller has disclosed that it paid for the reinstatement of Liberty-CITIC. Significantly, the reinstatement was applied for on August 30, 2016 and the company was restored on September 1, 2016 upon confirmation of payment of the required fees – after Boies Schiller had already noticed the ICC dispute.  In order to obtain such registration, Mr. Corsini was required by Boies Schiller to submit an affidavit claiming that Liberty-CITIC had ongoing business.

115.    During the ICC Arbitration, defendant Boies Schiller and plaintiff Liberty-CITIC have disclosed that Dentons had unpaid invoices for services provided to Liberty-CITIC in 2012 and 2013 allegedly aggregating approximately $1.9 million.

116.    Under the December 2016 Agreement, Dentons was obligated to make defendant Costan available to provide testimony as a fact witness in the ICC Arbitration, in exchange for additional fees, regardless of the truth or falsity of Costan's testimony, which was materially false.

117.    Additionally, defendants Dentons, Boies Schiller and Costan failed to disclose that Dentons required recognition of the Dentons Receivable and the indemnification by plaintiffs as further pre-conditions for Costan to be available.

118.    Liberty-CITIC and Boies Schiller have agreed that the past due fees owed to Dentons would be paid to Dentons from the proceeds of any award in the ICC Arbitration issued and paid in favor of Liberty-CITIC.  In the event that no award was issued in favor of Liberty-CITIC, Dentons maintained its right to collection of the past due fees, and in the event that Dentons was paid any such past fees, Costan, as a partner of Dentons, would be paid some portion of those collected fees.

### Count I
(Violations of RICO, 18 U.S.C. §1962(c))

119.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

120.    At all relevant times, plaintiffs were persons within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

121.    At all relevant times, each defendant is a person within the meaning of 18 U.S.C. §§1961(3) and 1962(c).

### A.    The Elements of a Section 1962(c) Violation

122.    "A violation of §1962(c)…requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."

123.    Here, the enterprise for purposes of 18 U.S.C. §1961(4) in substance is the legal team assembled by Dentons and Boies Schiller and their associated persons (the "Obstruction Enterprise") – an enterprise over which Boies Schiller, Dentons and their attorneys presided and which they conducted and controlled.

124.    The pattern of racketeering activity by which Boies Schiller, Dentons and their attorneys and others conducted the affairs of that enterprise include the wrongful, improper, and illegal actions identified in this Complaint.

### B.    The Enterprise

125.    In this case, defendants and their co-conspirators are a group of persons associated together in fact for the common purpose of conducting and carrying out an ongoing criminal enterprise, as described in this Complaint – namely, obstructing, influencing, and impeding various judicial proceedings so as to obtain a favorable ICC Award and interim orders during the ICC arbitration procedure form the Tribunal and with the exertion of pressure through intimidation and extortion of Mr. Corsini to testify in a certain manner, including to omit certain facts and testify about other facts that but for the omission or suppression of facts would have contradicted the testimony of defendants' damage expert and defendant Costan.

### C.    The Conduct

126.    Defendants and their conspirators have organized their operation into a cohesive group with specific and assigned responsibilities and a command structure, operating in the United States and France, funded primarily by Boies Schiller, a third-party funder and a

deferred compensation agreement with Dentons orchestrated by Boies Schiller, and directed by Boies Schiller and Dentons from the United States.

127.    Over the years defendants have adapted their scheme to defraud due to changing circumstances.  Moreover, defendants recruited new members to their operation and expanded the scope and nature of their activities.  While the organization of the criminal enterprise has changed over time, and its members may have held different roles at different times, the criminal enterprise has generally been structured to operate as a unit in order to accomplish the goals of their criminal scheme:

(A)    Defendants Dentons, Costan, Boies Schiller, Dumain, Green and Ohlemeyer have been responsible for oversight of the scheme to obstruct justice and defraud the ICC Tribunal and extort the plaintiffs, and have directed other defendants and conspirators to take actions necessary to accomplish the overall aims of the criminal enterprise – namely, manufacturing false testimony before the ICC Tribunal and obstructing the judicial processes of ICC Tribunal and Senegalese Courts by submitting perjured testimony and misleading pleadings.

(B)    Defendant Boies Schiller and Dentons have provided funding, directly and indirectly, and otherwise furthered the criminal enterprise.

128.    Defendants and their conspirators constitute an association-in-fact enterprise identified as the Obstruction Enterprise within the meaning of 18 U.S.C. §§1961(4) and 1962(c).  Each of the defendants participated in the operation, management and conduct of the Obstruction Enterprise.

129.    At all relevant times, the Obstruction Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. §1962(c).

**D.    *The Pattern of Racketeering Activity***

130.    Defendants conducted or participated, directly or indirectly, in the conduct, management, or operation of the Obstruction Enterprise's affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. §1961(5) and in violation of 18 U.S.C. §1962(c).

### (1)     Obstruction of Justice in Violation of 18 U.S.C. §1503

131.    Faced with SENELEC's claim since October 2012 that no contract existed between Liberty-CITIC and SENELEC, Dentons' baseless position, later reiterated by Boies Schiller, should never have been advanced by defendants and was ultimately categorically rejected by the ICC as well given both the facts and the law of the case.

132.    In a concerted effort to advance their racketeering violations, defendants and their affiliates and co-conspirators habitually filed or caused to be filed documents, including declarations sworn to under penalty of perjury, that falsely represented alleged prior judicial proceedings that in reality never took place.  By making these deliberate and strategic false representations in various pending state, federal and foreign judicial proceedings, with full awareness of their consequences and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. §1503.

### (2)     False Declarations in Violation of 18 U.S.C. §1512

133.    Defendants repeatedly made false material declarations and made submissions to the various tribunals knowing the declarations and submissions contained false material declarations.  By making these deliberate and material false representations in various pending state, federal and foreign judicial proceedings, with full awareness of their consequence and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, defendants have committed multiple instances of obstruction of justice in violation of 18 U.S.C. §1512.

### (3)     Deceit on the Court in Violation of New York Judiciary Law §487

134.    New York Judiciary Law §487 provides, in pertinent part, as follows: "An attorney or counselor who…[i]s guilty of any deceit or collusion, or consents to any deceit or

collusion, with intent to deceive the court or any party...[i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

135.    As previously described, Boies Schiller, Dentons and their attorneys engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive the ICC Tribunal.  Defendants Dumain, Green, Ohlemeyer, Boies Schiller and others, including Costan, a Dentons partner, actively participated in the preparation and filing of multiple arbitration submissions to the ICC Tribunal, which included false and misleading statements.  Defendants Dumain, Green, Ohlemeyer, Boies Schiller and others, including Costan, knowingly caused these misstatements to be filed with the intent of deceiving the ICC Tribunal.

136.    Defendant Costan and the Boies Schiller attorneys gave false testimony and submitted knowingly false documents in furtherance of the enterprise's underlying scheme, knowing that without such misrepresentations and falsifications, defendants' claims would have no standing pursuant to the ICC Rules and no possibility of prevailing before the ICC Tribunal. By not disclosing to the ICC Tribunal the truth about the lack of a contract which was *prima facie* evident under Senegalese law, by not considering claims against Dentons prior to the commencement and during the ICC arbitration, by inducing plaintiffs to enter into an improper indemnification agreement, and by procuring the witness testimony of defendant Costan in exchange for fees, defendants knowingly engaged in fraud with the intent to deceive plaintiffs, the ICC and the ICC Tribunal.

137.    As a result of the deceitful and fraudulent conduct by Boies Schiller, Dentons and their attorneys, plaintiffs have been injured in an amount to be established at trial substantially in excess of the value of the contract claimed in the ICC Arbitration.  By making

these deliberate and grossly misleading false representations in the ICC Arbitration and elsewhere, with full awareness of their consequences and with the specific intent to corruptly endeavor to influence, obstruct, and impede the due administration of justice, defendants have committed multiple instances of obstruction of justice in violation of law.

       *(4)    Extortion in Violation of New York Penal Law*

      138.    Defendants have engineered a wide-ranging campaign of judicial attacks based on false and misleading statements, and the intimidation of Mr. Corsini as a witness in the ICC Arbitration and have demanded that plaintiffs enter an indemnification agreement with Dentons, all with the intent and effect of procuring economic advantage from the plaintiffs through a litigation funding arrangement and fee arrangement causing a devastating economic loss to plaintiffs.

      139.    Defendants manufactured false evidence against plaintiffs and relied on that false evidence in the various proceedings with the intent and effect of causing a reasonable and actual fear of economic loss on the part of plaintiffs.

      140.    As described in this Complaint, the defendants conspired with each other to advance baseless claims in the ICC arbitration proceedings and gain economic advantage from the plaintiffs through a litigation funding arrangement and fee arrangement.

      141.    Defendants' actions were intended to induce fear in plaintiffs that the defendants would not act as counsel, among other things, and then continued to pursue a scheme of misrepresentation to the great harm of plaintiffs, unless and until Mr. Corsini agreed to transfer shares to a third-party, enter into the Dentons' indemnification agreement, enter into a contingency and funding arrangement and testify in a certain manner and omit the presentation of certain facts.

      142.    These actions have created a reasonable fear of harm on the part of plaintiffs, including fear of economic loss.

143.    By defendants' wrongful and extortionate acts to induce improper testimony from Mr. Corsini, defendants performed acts calculated to harm plaintiffs materially with respect to their financial position and reputation in violation of New York Penal Law §§110.00, 155.05(2)(e), 155.42.

### (5)    *Mail Fraud and Wire Fraud in Violation of 18 U.S.C. §§1341, 1343*

144.    As described in this Complaint, the ultimate objective of defendants' scheme or artifice to defraud was to defraud plaintiffs, as well as the ICC and the ICC Tribunal and SENELEC, through the fee and funding agreement and obstruct the judicial process so as to directly benefit the individual and organizational defendants.

145.    In furtherance of their scheme, defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

(i)    Emails incorporating false and misleading statements regarding the arbitration and the alleged existence of a contract with SENELEC;

(ii)    Wirings and/or mailings between and among the defendants concerning the preparation of submissions to the ICC Tribunal and Senegalese courts and testimony;

(iii)    Communications directed toward the ICC Tribunal and Senegalese Courts incorporating false and misleading statements regarding the ICC Arbitration;

(iv)    Funds transferred by Boies Schiller and Dentons to certain of the defendants, including from Boies Schiller to Dentons, with the intent that those funds be used to promote the carrying on of the defendants' criminal activities; and

(v)    Electronic filing and service of court papers containing false and misleading statements intended to impede the operation of the ICC and the ICC Tribunal.

146.     Defendants knowingly and intentionally prepared court papers, filings and testimony, which defendants knew to be false or misleading, to be disseminated to the ICC Tribunal and the ICC, with the intent that those statements be believed and that they formed the basis for an issuance of an award for damages in excess of $250 million by the ICC Tribunal.

147.     Defendants knowingly engaged in conduct with the intent to generate fear in plaintiffs such that Mr. Corsini should testify in a certain manner and consent to the execution of the Dentons' indemnification agreement and related transfer of shares to induce plaintiffs to enter into the Boies Schiller engagement and funding agreements and that if Mr. Corsini did not comply with defendants' extortionate demands then Boies Schiller would refuse to act, would refuse to continue to act, and he would be subject to various penalties, including imprisonment in France if he provided false and misleading testimony.

148.     Defendants' false and misleading statements and filings have been relied on by the ICC and the ICC Tribunal. Defendants' false and misleading statements have caused plaintiffs substantial damages.

*(6)     Money Laundering in Violation of 18 U.S C. §1956(a)(2)(A)*

149.     Defendants Boies Schiller and Dentons have on multiple occasions, acting in their individual capacities and/or as agents for each other, knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to Boies Schiller, Dentons, the ICC, experts in the ICC proceedings, legal counsel representing defendants in Senegalese court procedures and other entities with the intent that those funds be used to promote the carrying on of unlawful activity in violation of 18 U.S.C. §§1341, 1343 and 1951, including the false and misleading filings made in the ICC arbitration proceedings before the ICC and the ICC Tribunal and the funding of the defendants' pressure and extortion campaigns against plaintiffs.

150.    Defendants Boies Schiller and Dentons on multiple occasions have knowingly caused the transportation, transmission, and/or transfer of funds to or from the United States to Senegalese legal counsel, counsel assisting in Senegal for the ICC arbitration hearing and other entities with the intent that those funds be used to promote the carrying on of unlawful activity in violation of 18 U.S.C. §§1341, 1343 and 1951, including the false and misleading filings made in the U.S. and French courts and the funding of the defendants' extortionate campaign against plaintiffs.

*(7)*     ***Violations of 18 U.S.C. §1512***

151.    By the acts identified earlier in this Complaint, defendants have systematically and continuously violated the provisions of 18 U.S.C. §1512 relating to tampering and harassment in connection with judicial proceedings.

**Count II**
(Violations of RICO, 18 U.S.C. §1962(d))

152.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

153.    Defendants have unlawfully, knowingly and willfully combined, conspired, confederated and agreed together and with others to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

154.    Upon information and belief, defendants knew that they were engaged in a conspiracy to commit the predicate acts, and they knew that the predicate acts were part of such racketeering activity, and the participation and agreement of each of them was necessary to allow the commission of this pattern of racketeering activity.  This conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

155.    Upon information and belief, defendants agreed to conduct or participate, directly or indirectly, in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c).

156.    Each defendant knew about and agreed to facilitate the Enterprise's scheme to obtain property from plaintiffs. It was part of the conspiracy that the defendants and their conspirators would commit a pattern of racketeering activity in the conduct of the affairs of the Enterprise, including the acts of racketeering set forth in this Complaint.

157.    As a direct and proximate result of defendants' conspiracy, the acts of racketeering activity of the Enterprise, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), plaintiffs have been injured in their business and property, including the attorneys' fees and costs to defend themselves in objectively baseless, improperly motivated litigation in respect of the ICC Arbitration and related litigation in Sénégal.

158.    Pursuant to 18 U.S.C. §1964(c), plaintiffs are entitled to recover treble damages plus costs and attorneys' fees from the defendants.

## Count III
(Fraud)

159.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

160.    Defendants and their agents have knowingly misrepresented, omitted, and/or concealed material facts in their pleadings and representations before the ICC and the ICC Tribunal respecting whether a contract existed at all between SENELEC and Liberty-CITIC.

161.    These false representations are detailed throughout this Complaint and include false testimony before the ICC and the ICC Tribunal.

162.    Defendants made these false representations while knowing that their misrepresentations were materially false and that their omissions were material.

163.    Defendants further made these misrepresentations and omissions with the intent of obtaining favorable rulings in the ICC Arbitration proceedings and subsequent enforcement and collection of any such award.

164.    These material misrepresentations and omissions – although they are false and baseless – have been relied upon by the ICC and the ICC Tribunal.

165.    As a direct, proximate, and foreseeable result of defendants' fraud, plaintiffs have been harmed in their business and property.

166.    Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, plaintiffs are entitled to, and should be awarded, compensatory damages against each of the defendants.

## Count IV
(Violations of New York Judiciary Law §487)

167.    Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

168.    New York Judiciary Law §487 provides, in pertinent part, as follows: "An attorney or counselor who…[i]s guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party…[i]s guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

169.    As set forth above, defendants engaged in an intentional pattern of collusion, wrongdoing, and deceit with the intent to deceive plaintiffs, the ICC, the ICC Tribunal and the Senegalese Courts.

170.    Each of the defendants actively participated in the preparation and filing of multiple court submissions to the ICC, ICC Tribunal and Senegalese Courts, which included false and misleading statements respecting whether a valid contract had been entered into by Liberty-CITIC and SENELEC.  Defendants knowingly caused these misstatements to be filed with the intent of deceiving the ICC, the ICC Tribunal, the Senegalese Courts and plaintiffs.

171.    As a result of the deceitful and fraudulent conduct of defendants, plaintiffs have been injured in an amount to be established at jury trial.

172.    By reason of the foregoing, plaintiffs are entitled to monetary damages against defendants, plus treble damages and reasonable attorneys' fees pursuant to Judiciary Law §487.

## Count V
(Civil Conspiracy)

173.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

174.   As set forth above, defendants have committed torts against plaintiffs, including acts of racketeering giving rise to violations of RICO, fraud, and unjust enrichment.

175.   Defendants agreed to participate in a common scheme against plaintiffs. Defendants intentionally participated in the furtherance of a plan or purpose to obtain property from plaintiffs.  In furtherance of this plan or purpose, defendants committed overt and unlawful acts, including acts of racketeering.

176.   As a direct and proximate result of the defendants' conspiracy, the overt acts committed in furtherance of that conspiracy, and the torts committed against plaintiffs, plaintiffs have been damaged.

177.   Defendants have engaged in the malicious, willful, and fraudulent commission of wrongful acts and, because of the reprehensible and outrageous nature of these acts, plaintiffs are entitled to, and should be awarded, compensatory damages against each of the defendants.

## Count VI
(Unjust Enrichment)

178.   Plaintiffs reallege and incorporate herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

179.   Defendants Boies Schiller and Dentons obtained economic benefit from a third-party funder using the fee and funding agreement with Boies Schiller and the indemnification agreement with Dentons and but for plaintiffs having entered into those agreements and having been induced to enter into those agreements such economic benefits would not have been gained

by defendants. Boies Schiller and Dentons have been unjustly enriched by benefits obtained due to those agreements.

180.　Any property that Boies Schiller and Dentons obtained from plaintiffs through those agreements was acquired as a result of defendants' tortious, illegal, and fraudulent conduct, as set forth herein, including the ICC arbitration procedure itself.

WHEREFORE, plaintiffs demand judgment as follows:

- On Count I, in an amount of compensatory damage to be determined at trial by jury but believed to exceed $300 million, to be trebled in accordance with RICO;

- On Count II, an amount of compensatory damage to be determined at trial by jury but believed to exceed $300 million, to be trebled in accordance with RICO;

- On Count III, an amount of compensatory damage to be determined at trial by jury but believed to exceed $300 million;

- On Count IV, an amount of compensatory damage to be determined at trial by jury but believed to exceed $300 million;

- On Count V, an amount of compensatory damage to be determined at trial by jury but believed to exceed $300 million;

- On Count VI, an amount of compensatory damage to be determined at trial by jury but believed to exceed $300 million;

- Punitive damages in an amount to be determined at trial by jury but believed to exceed $300 million;

- An award of attorney's fees, costs and expenses; and

- Such other and further relief as the Court deems just and proper.

Dated: New York, New York
         April 26, 2024

PAUL BATISTA, P.C.

By: _____
     Paul Batista
Attorney for Plaintiffs
     Frank Corsini,
     Liberty ECO Energy LLC, and
     Liberty-CITIC Energy Cayman Ltd.
26 Broadway, Suite 1900
New York, New York 10004
(631) 377-0111
Batista007@aol.com

*Of Counsel:*
Benoit Le Bars
*Attorney-at-Law*
Lazareff Le Bars Eurl
10, Place Vendôeme
Paris, France 75001
lebars@l-lb.com